**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

HANNAH JONES, *individually and on behalf of all others similarly situated,*

Plaintiff,

v.

BECKER PROFESSIONAL DEVELOPMENT CORPORATION d/b/a BECKER PROFESSIONAL EDUCATION,

Defendant.

Case No. _____________

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Hannah Jones brings this class action lawsuit, on behalf of herself and all other persons similarly situated, against Becker Professional Development Corporation d/b/a Becker Professional Education ("Becker" or "Defendant") for violations of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). Plaintiff's allegations are made further to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This case is a consumer digital privacy class action lawsuit against Becker for violating the VPPA by disclosing its digital subscribers' personally identifiable information ("PII"), including their Facebook ID and their video viewing history and services (together,

"Personal Viewing Information") to Meta Platforms, Inc. ("Facebook") and other third parties without proper consent.[1]

2. The VPPA prohibits "video tape service providers," such as Becker, from knowingly disclosing consumers' Personal Viewing Information including "information which identifies a person as having requested or obtained specific video materials or services from a video tape provider," without express consent in a stand-alone consent form. *See* 18 U.S.C. § 2710(a)(3).

3. Becker provides online courses such as CMA (Certified Management Account) Exam Review, CPA (Certified Public Accountant) Exam Review, and CPE (Continued Professional Education) materials for CPA, CMA and CPE students.[2] Becker markets and sells business professionals access to its digital library on its website, www.becker.com ("Website"),[3] and its mobile app so that they may view prerecorded video materials to prepare for the CMA Exam, CPA Exam, and to fulfill their CPE requirements.[4]

---

[1] While this complaint focuses on unauthorized disclosures to Facebook, Plaintiff's counsels' investigation shows that Becker also installed tracking codes from several other big tech data brokers such as Bing (Microsoft), Google, LinkedIn, TikTok, and Twitter, among others, on its website.

[2] *See* https://www.linkedin.com/company/-becker-professional-education/.

[3] Becker's Website contains subdomains for different course materials, such as cpa.becker.com, cpelearning.becker.com, cma.becker.com. The same Meta Pixel is installed across all these subdomains, capturing Becker subscribers' video viewing history and habits in the same manner.

[4] Absent discovery, Plaintiff is unable to independently confirm whether Becker installed third-party tracking technologies on its mobile app and/or any other digital platforms owned, controlled, and/or operated by Becker. However, given the presence of such trackers on the Becker Website, Plaintiff alleges, upon information and good faith belief, that Defendant is capturing and sharing its subscribers' Personal Viewing Information via the mobile app as well.

4. According to Becker, over one million professionals have prepared for exams and fulfilled their professional continuing education requirements using Becker's courses.[5]

5. These online courses can be quite expensive. For example, accountants who utilize Becker's CPA Online Courses & Exam Review can take online "Core Example Single Part Courses" such as "Audit Exam Review" or "Financial Exam Review" for $849.00 for 24 months, take one of Backer's "Discipline Exam Single Part Courses" for $849.00 for 24 months, or sign up for an online CPA Exam plan, which range in price from $2,499 to $4,999 a year.[6]

6. Defendant has systematically transmitted (and continues to transmit today) its subscribers' Personal Viewing Information to Facebook using a snippet of programming code called the "Meta Pixel" (the "Pixel"), which Defendant chose to install and configure on its Website.

7. The information Defendant disclosed (and continues to disclose) to Meta via the Pixel includes the subscriber's Facebook ID ("FID") and the title of the specific prerecorded video material that each of its subscribers requested or purchased on its Website. An FID is a unique sequence of numbers linked to a specific Facebook profile. A Facebook profile, in turn, identifies by name the specific person to whom the profile belongs (and also contains other personally identifying information about the person). Entering "Facebook.com/[FID]" into a web browser returns the Facebook profile of the person to whom the FID corresponds. Thus, the FID identifies a person more precisely than a name, as numerous persons may share the same name, but each person's Facebook profile (and associated FID) uniquely identifies one and only one person. In

---

[5] *See* https://becker.com/.

[6] *See* https://www.becker.com/cpa-review/courses/; *see also* https://www.becker.com/cpa-single-part-courses.

the simplest terms, the Pixel installed by Defendant captures and discloses to Facebook information that reveals the specific Personal Viewing Information of the subscriber.

8. The subscribers are not aware that through the use of the Pixel, Becker tracks and discloses to third-parties their Personal Viewing Information nor have they consented to share such information.

9. Importantly, Becker shares the Personal Viewing Information with third parties as one data point meaning that any ordinary person can use it to quickly and easily locate, access and view subscribers' corresponding account(s) and/or profile(s).

10. Without informing its subscribers, Becker profits from its unauthorized disclosure of its subscribers' Personal Viewing Information, from the advertising and information services that stem from use of the Pixel, at the expense of its subscribers' privacy and their statutory rights under the VPPA.

11. Because Becker subscribers are ***not*** informed about this collection and disclosure of their Personal Viewing Information—as it is automatic and invisible—they cannot make informed decisions as to which, if any, videos to watch nor take any proactive measures to defend themselves against the highly personal ways Becker has used and continues to use the data it has about them to make money for itself.

12. Becker chose to disregard Plaintiff's and millions of others of its subscribers' statutorily protected privacy rights by releasing their protected information to third parties.

13. The VPPA clearly prohibits what Defendant has done. Subsection (b)(1) of the VPPA provides that, absent the consumer's prior informed, written consent, any "video tape service provider who knowingly discloses, to any person, personally identifiable information

concerning any consumer of such provider shall be liable to the aggrieved person for," 18 U.S.C. § 2710(b)(1), damages in the amount of $2,500.00, see id. § 2710(c).

14. Plaintiff brings this class action for legal and equitable remedies to redress and put a stop to Becker's practices of intentionally disclosing its subscribers' Personal Viewing Information to Facebook or any other third parties in knowing violation of VPPA.

## PARTIES

15. Plaintiff Hannah Jones is, and has been at all relevant times, a resident of Rochester, Monroe County, New York, and intends to remain there.

16. Defendant Becker is a Delaware business with its principal place of business at 399 South Spring Avenue, Suite 108 in St. Louis, Missouri 63110.

17. Defendant owns and operates its website, available at www.becker.com, which is used throughout the United States, including the state of New York.

## JURISDICTION AND VENUE

18. This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over the claims that arise under the VPPA, 18 U.S.C. § 2710. This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class (defined below) exceeds $5,000,000 and at least one member of the Class is a citizen of a state different from that of Defendant.

19. This Court has personal jurisdiction over Defendant because Defendant regularly conducts business in the State of New York.

20. This Court has personal jurisdiction over Becker because Defendant has intentionally directed its business activities in New York, targeting the New York market, and purposefully availed itself of the privilege of conducting business in this state, including by

providing courses and videos specifically aimed at satisfying requirements of the New York State Board for Public Accountancy and New York CPA Exam requirements. In addition, the conduct underlying the claims that caused Plaintiff's injuries took place in New York, that is, Defendant's interception and disclosure of Plaintiff's Personal Viewing Information occurred in this state which was foreseeable to Defendant.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

### I. The Background of the VPPA.

22. The VPPA generally prohibits the knowing disclosure of information that personally identifies consumers (like Plaintiff) as having viewed particular videos or other audio-visual materials without the informed, written consent of the customer in a form "distinct and separate from any form setting forth other legal or financial obligations." Under the statute, the Court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorney's fees.

23. Specifically, subject to certain exceptions that do not apply here, the VPPA prohibits "a video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]" 18 U.S.C. § 2710(b)(1). The statute defines a "video tape service provider" as "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4). It defines a "consumer" as "a renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). "'[P]ersonally identifiable

information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

24. The VPPA was initially passed in 1988 for the explicit purpose of protecting the privacy of individuals' and their families' video rental, purchase and viewing data. Leading up to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 7-8 (1988).

25. Senators at the time the VPPA was passed were particularly troubled by disclosures of records that reveal consumers' having viewed or purchased videos and other audiovisual materials because records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon & Leahy, respectively).

26. In proposing the Video and Library Privacy Protection Act (later codified as the VPPA), Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). Thus, the personal nature of such information, and the need to protect it from disclosure, is the inspiration of the statute: "[t]hese activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests, and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

27. While these statements rang true in 1988 when the VPPA was passed, the importance of legislation like the VPPA in the modern era of data mining from online activities is more pronounced than ever before.

28. During a recent Senate Judiciary Committee meeting, "*The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*," Senator Leahy emphasized the point by stating: "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[7]

29. In this case, Becker chose to deprive Plaintiff and the Class members (as defined *infra* in the "Class Definition" section) of that right by knowingly and systematically disclosing their Personal Viewing Information to unauthorized third parties without providing notice or obtaining consent from anyone, as explained herein.

## II. Becker's Digital Subscriptions.

30. To register for Becker's online courses, subscribers create a profile and account with Defendant on its digital properties such as the Website and the Becker mobile app.

31. Becker subscribers provide their personal information, including but not limited to their name, email address, phone, address or postal code, and payment method(s).

32. Becker's online courses are available as videos online and on a broad range of devices, including mobile phones and other mobile devices.

---

[7] *See* Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, https://www.judiciary.senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century.

33. On information and belief, all subscribers provide Defendant with their IP address, which is a unique number assigned to all information technology connected devices, that informs Defendant as to subscribers' city, zip code and physical location.

34. When opening an account, Becker does not adequately disclose to its subscribers that it will share their Personal Viewing Information with third parties. subscribers are also not asked to consent to disclosing such information.

35. After becoming a subscriber, subscribers have access to a variety of video materials through Becker's website or app.

36. Notably, once a subscriber signs in and watches a video of a Becker lecture, the subscriber is not provided with any notification that their Personal Viewing Information is being shared.

37. Defendant also fails to obtain subscribers' written consent to collect and disclose their Personal Viewing Information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," as the VPPA requires.

**III. Becker Fails to State It Discloses Personal Viewing Information, as Required under the VPPA.**

38. Defendant's operative privacy policy describes "the types of personal information we may collect about you, how we collect, use, process and disclose your personal information, and the choices you can make about how we collect, use, process and disclose your personal information."[8]

[8] https://www.becker.com/privacy-policy (Oct. 8, 2024).

39. The circumstances under which Defendant states that it may disclose a subscriber's personal information do not include the disclosure of Personal Viewing Information to third parties like Facebook.

40. Nowhere in Becker's privacy policy does Defendant disclose that it will share subscribers' private and protected Personal Viewing Information.

**IV. Facebook and the Meta Pixel.**

41. Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active subscribers. Facebook describes itself as a "real identity platform,"[9] meaning subscribers are allowed only one account and must share "the name they go by in everyday life."[10] To that end, when creating an account, subscribers must provide their first and last name, along with their birthday and gender.

42. Facebook sells advertising space by highlighting its ability to target subscribers.[11] Facebook can target subscribers so effectively because it surveils subscriber activity both on and off its site. This allows Facebook to make inferences about subscribers beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[12] Facebook compiles this

---

[9] Sam Schechner and Jeff Horwitz, *How Many subscribers Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[10] *Community Standards, Part IV: Integrity and Authenticity*, https://www.facebook.com/communitystandards/integrity_authenticity.

[11] *Why Advertise on Facebook*, https://www.facebook.com/business/help/205029060038706.

[12] *Ad Targeting: Help Your Ads Find the People Who Will Love Your Business*, https://www.facebook.com/business/ads/ad-targeting.

information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[13]

43. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically. One such Business Tool is the Meta Pixel.

44. The Meta Pixel is a piece of code that advertisers, like Defendant, can integrate into their website. Once activated, the Meta Pixel "tracks the people and type of actions they take."[14] When the Meta Pixel captures an action, it sends a record to Facebook. Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

45. Facebook also uses unique and persistent identifiers that are assigned to each subscriber. The Pixel transmits the subscriber's c_user cookie, which contains that subscriber's unencrypted Facebook ID, and allows Facebook to link the subscriber's online communications and interactions to their individual Facebook profile. With a subscriber's FID, Facebook and any ordinary person can look up subscriber's profiles.

46. Facebook receives at least eleven cookies when Defendant's Website transmits information via the Meta Pixel. One of them is the fr cookie which contains an encrypted Facebook ID and browser identifier.[15] Facebook, at a minimum, uses the fr cookie to identify subscribers,

---

[13] *Core Audiences*, https://www.facebook.com/business/news/Core-Audiences.

[14] *Retargeting*, https://www.facebook.com/business/goals/retargeting.

[15] Data Protection Commissioner, *Facebook Ireland Ltd: Report of Re-Audit*, p. 33 (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf (last visited June 20, 2024).

and this particular cookie can stay on a subscriber's website browser for up to 90 days after the subscriber has logged out of Facebook.[16]

47. The c_user id and fr cookies above are commonly referred to as third-party cookies because they were "created by a website with a domain name other than the one the subscriber is currently visiting"—i.e., Facebook. Although Facebook created these cookies, Defendant is ultimately responsible for the manner in which individual Website subscribers were identified via these cookies, and Facebook would not have received this data but for Defendant's implementation and use of the Pixel throughout its Website.

48. Defendant also revealed its Website visitors' identities via first-party cookies such as the _fbp cookie that Facebook uses to identify a particular browser and a user, *Figure 1*:[17]

| Name ▲ | Value | Domain | Path | Expires / Max-A.. |
|---|---|---|---|---|
| _fbp | fb.1.1723656375798.858... | .becker.com | / | 2025-01-16T17:.. |

49. Importantly, the _fbp cookie is transmitted to Facebook even when the user's browser is configured to block third-party tracking cookies because, unlike the fr cookies and c_user cookie, the _fbp cookie functions as a first-party cookie—i.e. a cookie that was created and placed on the website by Defendant.[18]

50. The Facebook Pixel uses both first- and third-party cookies when capturing and disclosing subscribers' Personal Viewing Information from Becker's Website.

---

[16] *Cookies & other storage technologies*, https://www.facebook.com/policy/cookies/ (last visited Oct. 18, 2024).

[17] *Id.*

[18] The _fbp cookie is always transmitted as a first-party cookie.

51. In summation, Facebook, at a minimum, uses the c_user, fr, _fbp cookies to link website visitors' communications and online activity with their corresponding Facebook profiles, and, because the Pixel is automatically programmed to transmit data via both first-party and third-party cookies, subscribers' information and identities are revealed to Facebook even when they have disabled third-party cookies within their web browsers.

52. Becker installed the Meta Pixel on its Website, which discloses Plaintiff's and Class Members' Personal Viewing Information to Facebook, because Becker benefits financially from the advertising and information services that stem from use of the Meta Pixel.

53. When a Becker subscriber visits the Website or other streaming product and watches videos on the website, Defendant discloses certain information about the viewer including, but not limited to, their identity and the video content the subscriber watched, to Facebook. Specifically, Becker sends the titles of the videos subscribers request or obtain and, most notably, the viewers' personally identifiable information, including their FID, to third parties.

54. When a Facebook user with one or more personally identifiable FID cookie on their browser views videos on the Website, that Becker product, through its computer code, causes the subscriber's identity and viewed videos to be transmitted to Facebook.

55. This transmission is not the subscribers' decision but results from Defendant's purposeful use of its Meta Pixels by incorporation of those pixels and code into the Website. Defendant could easily program the Meta Pixel so that this information is not automatically transmitted to Facebook when a subscriber views videos.

56. Facebook can easily identify any individual on its Facebook platform with only their unique FID, as can any ordinary person who comes into possession of an FID.

57. Facebook admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile. Simply put, with only an FID—which Defendant knowingly and readily provides to Facebook without any consent from the subscribers—any ordinary person could learn the identity of the digital subscriber.

58. At all relevant times, Becker knew that the Meta Pixel disclosed Personal Viewing Information to Facebook. This was evidenced from, among other things, the functionality of the Meta Pixel, including that it enabled Defendant to show targeted advertising to its subscribers based on the videos those subscribers had previously viewed on the Website.

**V. Becker Unlawfully Discloses Its Subscribers' Personal Viewing Information to Unauthorized Third Parties.**

59. Becker's Website hosts the Meta Pixel and transmits PageView data and other events to Facebook, which include descriptive Uniform Resource Locators ("URL") dedicated solely to Becker videos, including the titles of those videos.

60. Becker is ***not*** sharing anonymized, non-personally identifiable data with third parties like Facebook. To the contrary, the data it discloses is tied to unique identifiers, including the FID, that identify specific subscribers. Defendant has thus monetized its database by disclosing its subscribers' Personal Viewing Information to third parties without the consent of its subscribers and to the detriment of their legally protected privacy rights.

61. For instance, as shown in the screenshot below, when a subscriber navigates to the website and selects a CPA Exam Review course to request or purchase, Defendant discloses to Facebook the Personal Viewing Information to Facebook via several 'events' including Pageview, SubscribedButtonClick, AddToCart and custom events like "CPE Purchase."

***Figures 2, 3 & 4: Examples of a HTTP single communication session sent from the customer's device by Becker's Pixel to Facebook that reveals the fact that the subscriber is adding to cart the online course "Audit Exam Review," along with the customer's unique personal identifiers including the FID (c_user field), the fr and _fbp cookies:***






▼ Request Headers

| | |
|---|---|
| :authority: | www.facebook.com |
| :method: | GET |
| :path: | /tr/?id=180160859381814&ev=AddToCart&dl=https%3A%2F%2Fwww.becker.com%2Fcpa-single-part-courses%2Faudit-single-part-course&rl=https%3A%2F%2Fwww.becker.com%2Fcpa-single-part-courses&if=false&ts=1729106979692&cd[content_category]=CPA&sw=1664&sh=1110&v=2.9.171&r=stable&ec=2&o=4126&fbp=fb.1.1723656375798.858144756877624618&ler=other&cdl=API_unavailable&it=1729106872850&coo=false&rqm=GET |
| :scheme: | https |
| Accept: | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| Accept-Encoding: | gzip, deflate, br, zstd |
| Accept-Language: | en-US,en;q=0.9,ru;q=0.8 |
| Cache-Control: | no-cache |
| Cookie: | sb=GrxtY1jj9lKWnpCg7UAhiJMv; datr=Y5OdZurO628alqBiNG42Gs_R; ps_n=1; ar_debug=1; dpr=1.5; locale=en_US; c_user=54( 061; fr=1VzFKdwvOkdR10vi6.AWXyGO3YWulhkWJpwVLrrJZP7fg.BnD_eh..AAA.0.0.BnD_eh.AWXhyZUKulk; xs=9%3ANLzniTme8XLOeQ%3A2%3A1728664614%3A-1%3A3037%3A%3AAcURYRpuT8yM26VYsY6ttqPgXU5F_bjXHhpZw3fCVg |
| Pragma: | no-cache |
| Priority: | i |
| Referer: | https://www.becker.com/ |
| Sec-Ch-Ua: | "Google Chrome";v="129", "Not=A?Brand";v="8", "Chromium";v="129" |

62. In order to complete the purchase, Becker requires subscribers to sign up for an account, providing their PII including name, phone and email address.

63. Becker also chose to configure the so-called "Advanced Matching" feature for its Pixel, which tracks and discloses to Facebook subscribers' additional personal identifiers entered into the Website forms, including the subscriber's name, email and phone number – as reflected in the [udff] value parameters below, *Figure 5*:




64. Facebook uses this PII, including the c_user, fr and _fbp cookie data, and the subscriber's FID to identify and match subscribers and the video content they purchased and viewed on the Website, to its own database of Facebook users.

65. Becker continues to track and disclose to third parties its customers' Personal Viewing Information as they sign up for an account with Becker, including the online courses they add to their virtual online shopping cart (via the 'AddToCart' event), *Figure 6*:




66. Becker then tracks and discloses subscribers' Personal Viewing Information when they log in to view the requested or purchased video material and the actions they take once they are logged-in (for example, whether they exit or resume a specific video, or click to access available "Reference Materials" for the video in question) alongside their unique personal identifiers, including their FID:

***Figures 7 & 8: Examples of HTTP communication sessions sent from the customer's device by Becker's Pixel to Facebook that reveal the fact that the subscriber is watching the online course "Excel: Cool Tricks," along with the customer's unique personal identifiers including the FID (c_user field).***






***Figure 9: Example of a HTTP communication session sent from the customer's device by Becker's Pixel to Facebook that reveals the subscriber's PII such as their email and phone number, while accessing CPE learning online video materials on the Website.***




67. As a result of Becker's data compiling and sharing practices, Defendant has knowingly disclosed to Facebook for its own profit the Personal Viewing Information of Defendant's subscribers, together with additional sensitive personal information.

68. Becker does not seek its subscribers' prior written consent to the disclosure of their Personal Viewing Information (in writing or otherwise) and its customers remain unaware that their Personal Viewing Information and other sensitive data is being disclosed to unauthorized third parties.

69. By disclosing its subscribers' Personal Viewing Information to unauthorized third parties—which undeniably reveals their identity and the specific video materials they requested or purchased from Defendant's Website—Defendant has intentionally and knowingly violated the VPPA.

## PLAINTIFF'S EXPERIENCE

70. Plaintiff Jones first purchased a CPA Exam Review package from Becker on May 20, 2020 and a CPE Compliance Tracker on January 19, 2024.

71. Plaintiff became a user and subscriber of Becker's services by providing, among other information, her name, address, email address, IP address (which informs Defendant as to the city and zip code she resides in as well as her physical location), and any cookies associated with her devices. Accordingly, Plaintiff requested or obtained, and is therefore a consumer of, prerecorded video material sold by Defendant on its Website.

72. Plaintiff watched the purchased pre-recorded CPA Exam Review videos on Becker's Website from May 2020 until September 2022, and CPE videos in January 2024.

73. During the relevant time period, Plaintiff used her Becker digital subscription to view videos and related video services through the Becker Website on her personal devices such as her laptops and phone, while logged into her Facebook account. Plaintiff has used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant period in this case.

74. Plaintiff has had an active Facebook account since at least 2012. Her Facebook account is in her real name and displays her personally identifiable information such as her name and photos to the general public.

75. When Plaintiff purchased and watched videos through Becker, Defendant disclosed her event data, which recorded and disclosed the videos' titles to Facebook. Defendant also disclosed Plaintiff Jones's personally identifiable information, including her name, email, phone number as well as her Facebook ID, the _fbp, and _fr cookies to Meta.

76. Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Personal Viewing Information to third parties.

77. Plaintiff has never been provided any written notice that Defendant discloses her subscriber's Personal Viewing Information or any means of opting out of such disclosures of her Personal Viewing Information.

78. Defendant nonetheless knowingly disclosed Plaintiff's Personal Viewing Information to third parties.

79. Because Plaintiff is entitled by law to privacy in her Personal Viewing Information, Defendant's disclosure of her Personal Viewing Information deprived Plaintiff of the full set of benefits to which she is entitled.

## TOLLING, CONCEALMENT & ESTOPPEL

80. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

81. Defendant secretly incorporated the Meta Pixel into its Website, providing no indication to subscribers that their Personal Viewing Information would be disclosed to unauthorized third parties.

82. Defendant had exclusive knowledge that the Meta Pixel was incorporated on its Website, yet failed to disclose that fact to subscribers, or inform them that by purchasing and watching videos on the Website Plaintiff's and Class Members' Personal Viewing Information would be disclosed to third parties, including Facebook.

83. Plaintiff and Class Members could not with due diligence have discovered the full scope of Defendant's conduct because the incorporation of the Meta Pixel is highly technical and there were no disclosures or other indications that would inform a reasonable consumer that

Defendant was disclosing and allowing Facebook to intercept subscribers' Personal Viewing Information.

84. As alleged above, Defendant had a duty to disclose the nature and significance of its data disclosure practices, including the disclosure of subscribers' Personal Viewing Information but failed to do so. Defendant is therefore estopped from relying on any statute of limitations under the discovery rule.

85. Plaintiff did not discover that Defendant disclosed her Personal Viewing Information to unauthorized third parties until October 2024, after contacting undersigned counsel and discussing potential claims against Defendant.

## CLASS ALLEGATIONS

86. **Class Definition:** Plaintiff seeks to represent a class of similarly situated individuals defined as follows:

> All persons in the United States who, while maintaining an account with Meta Platforms, Inc. f/k/a Facebook, Inc: (i) were registered subscribers of an online website, mobile application and/or any video-on-demand service or application owned, controlled, and/or operated by Becker and (ii) who viewed videos on an online website, mobile application, or any video-on-demand service or application owned, controlled, and/or operated by Becker.

87. Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

88. **Numerosity (Fed. R. Civ. P. 23(a)(1)):** Class members are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in at least the tens of thousands. At this time, Plaintiff does not know the exact number of members of the aforementioned Class. However, given the popularity of Defendant's Website,

the number of persons within the Class and Subclass is believed to be so numerous that joinder of all members is impractical. And such information is available to Defendant.

89. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

(a) whether Defendant collected Plaintiff's and the Class's personally identifiable information and video viewing activity;

(b) whether Defendant unlawfully disclosed and continues to disclose its subscribers' personally identifiable information and video viewing activity in violation of the VPPA;

(c) whether Defendant's disclosures were committed knowingly; and

(d) whether Defendant disclosed Plaintiff's and the Class's personally identifiable information and video viewing activity without consent.

90. **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiff's claims are typical of those of the Class and Subclass because Plaintiff, like all members of the Class and Subclass, used Defendant's Website to watch videos, and had her personally identifiable information and video viewing activity collected and disclosed by Defendant.

91. **Adequacy (Fed. R. Civ. P. 23(a)(4):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA. Plaintiff and her counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class and Subclass. Neither Plaintiff nor her counsel has any interest adverse to, or in conflict with, the interests of the absent members of the Class or Subclass. Plaintiff has raised viable statutory claims or the type reasonably expected to be raised

by members of the Class, and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class and Subclass, additional claims as may be appropriate, or to amend the definition of the Class and Subclass to address any steps that Defendant took.

92. **Superiority (Fed. R. Civ. P. 23 (b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class and Subclass is impracticable. Even if every member of the Class and Subclass could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class and Subclass. Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT, 18 U.S.C. § 2710, *et seq.*
### (*On behalf of Plaintiff & the Class*)

93. Plaintiff incorporates the preceding paragraphs by reference as if fully set forth herein.

94. The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any consumer to a third-party without the

"informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C § 2710.

95. Defendant is a "video tape service provider" because it has created, hosted, sold, and delivered hundreds of videos on its Website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

96. As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service provider." Plaintiff and members of the Class are "consumers" because they subscribed to and purchased continuing education and test preparation courses which included prerecorded video material from Defendant on Becker's Website. 18 U.S.C. § 2710(a)(1).

97. As defined in 18 U.S.C. § 2710(a)(3), "personally identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

98. Defendant knowingly caused Personal Viewing Information concerning Plaintiff and Class Members to be disclosed to unauthorized third parties, including Facebook, through its installation and configuration of the Pixel.

99. The Personal Viewing Information that Defendant transmitted to Meta constitutes "personally identifiable information" as defined in 18 U.S.C. § 2710(a)(3) because it identified each Plaintiff and Class Member to Meta as an individual who purchased or viewed, and thus "requested or obtained," specific prerecorded video material from Defendant via its Website.

100. As set forth in 18 U.S.C. § 27109(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations

of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner."

101. Defendant failed to obtain informed, written consent under this definition from Plaintiff and Class Members.

102. Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA.

103. Defendant's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

104. In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election."

105. Defendant failed to provide an opportunity to opt out as required by the VPPA.

106. Defendant knew that its disclosures identified Plaintiff and Class Members to third parties. Defendant also knew that Plaintiff's and Class Members' Personal Viewing Information was disclosed to third parties, because, *inter alia*, Defendant chose, installed, and programmed the Pixel and other tracking technology with the intent that those third parties receive the Personal Viewing Information, including the subscribers' FID and/or their name, phone number, and email address.

107. By disclosing Plaintiff's and the Class's Personal Viewing Information, Defendant violated Plaintiff's and Class Members' statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

108. As a result of the above violations, Defendant is liable to the Plaintiff and Class Members for actual damages related to their loss of privacy in an amount to be determined at trial or alternatively for "liquidated damages not less than $2,500 per plaintiff."

109. Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

(b) For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Class and Subclass on all counts asserted herein;

(d) An award of statutory damages to the extent available;

(e) For punitive damages, as warranted, in an amount to be determined at trial;

(f) For prejudgment interest on all amounts awarded;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit.

**JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable.

Dated: November 1, 2024

Respectfully submitted,

*s/: David S. Almeida*
David S. Almeida
New York Bar No. 3056520
Matthew J. Langley*
New York Bar No. 4831749
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Tel: (312) 576-3024
E: david@almeidalawgroup.com
E: matt@almeidalawgroup.com

***Counsel for Plaintiff & the Putative Class***

* *Pro Hac Vice* forthcoming