**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HANNAH JONES, *individually and on behalf of all other similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>BECKER PROFESSIONAL DEVELOPMENT CORPORATION D/B/A BECKER PROFESSIONAL EDUCATION,<br><br>Defendant. | Case No. 6:24-cv-6643 |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS


**TABLE OF AUTHORITIES** ........ ii

**INTRODUCTION** ........ 1

**BACKGROUND** ........ 3

A. The Website ........ 3

B. Plaintiff ........ 3

C. The Meta Pixel ........ 4

D. The Claim and Proposed Classes ........ 4

**ARGUMENT** ........ 4

**I. PLAINTIFF'S VPPA CLAIM FAILS IN MULTIPLE WAYS.** ........ 5

A. The VPPA's Text And Legislative History Indicate Video Tape Service Providers Are Limited To Providers Of Pre-Recorded Materials "Similar" To Movies, Not Educational Videos Like Those On The Website. ........ 6

B. An Ordinary Person Could Not Identify PII From The Allegedly Disclosed Information. ........ 8

**II. THE COMPLAINT FAILS TO PLEAD A BASIS FOR EQUITABLE TOLLING OR ESTOPPEL.** ........ 11

A. Equitable Tolling Is Not Warranted. ........ 12

i. The Complaint does not allege "extraordinary circumstances." ........ 12

ii. The Complaint does not allege Plaintiff's due diligence. ........ 15

B. Equitable Estoppel Is Not Warranted. ........ 17

C. Plaintiff's allegations fail to satisfy Rule 9(b). ........ 18

**CONCLUSION** ........ 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abercrombie v. Andrew Coll.*,
438 F. Supp. 2d 243 (S.D.N.Y. 2006) ........ 18

*Acquest Holdings, Inc v. Travelers Cas. & Surety Co.*,
217 F. Supp. 3d 678 (W.D.N.Y. 2016) ........ 15

*Aldana v. Gamestop, Inc.*,
No. 22-CV-7063-LTS, 2024 WL 708589 (S.D.N.Y. Feb. 21, 2024) ........ 8

*Alvi v. Aqua at Lakeshore East LLC*,
No. 12 CV 2662, 2013 WL 3785622 (E.D.N.Y. July 18, 2013) ........ 13

*Baldayaque v. United States*,
338 F.3d 145 (2d Cir. 2003) ........ 14

*Boos v. Runyon*,
201 F.3d 178 (2d Cir. 2000) ........ 12

*Broccoli v. Ashworth*,
No. 21-CV-6931, 2024 WL 1199549 (S.D.N.Y. Mar. 20, 2024) ........ 17

*Buttry v. Gen. Signal Corp.*,
68 F.3d 1488 (2d Cir. 1995) ........ 18

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) ........ 16

*In re Columbia College Rankings Class Action*,
No. 22-cv-5945, 2024 WL 1312511 (S.D.N.Y. Mar. 6, 2024) ........ 15

*Contrera v. Langer*,
278 F. Supp. 3d 702 (S.D.N.Y. 2017) ........ 13

*De Sole v. Knoedler Gallery, LLC*,
974 F. Supp. 2d 274 (S.D.N.Y. 2013) ........ 19

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
747 F.3d 145,151-52 (2d Cir. 2014) ........ 9

*Edwards v. Learfield Commc'ns, LLC*,
697 F. Supp. 3d 1297 (N.D. Fla. 2023) ........ 12

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ........ 8, 9

*Ellis v. Cartoon Network, Inc.*,
803 F.3d 1251 (11th Cir. 2015) .......... 1, 5

*Ellul v. Congregation of Christian Bros.*,
774 F.3d 791 (2d Cir. 2014) .......... 18

*Fire & Police Association of Colorado v. Bank of Montreal*,
368 F. Supp. 3d 681 (S.D.N.Y. 2019) .......... 16, 17

*Foster v. Walgreen Co.*,
12 F. Supp. 3d 615 (W.D.N.Y. 2014) (Wolford, J.) .......... 13

*Futterman v. Wash. Mut. Bank, FA*,
No. 1:10-CV-01002, 2010 WL 5067650 (N.D.N.Y. Dec. 6, 2010) .......... 19

*Grecco v. Age Fotostock Am., Inc.*,
No. 21-cv-423, 2021 WL 3353926 (S.D.N.Y. Aug. 2, 2021) .......... 16

*Hughes v. Nat'l Football League*,
No. 1:22-cv-10743, 2024 WL 4063740 (Sept. 5, 2024) .......... 16

*Jones v. Commissioner of Social Security*,
No. 6:23-CV-06265, 2024 WL 475050 (W.D.N.Y. Feb. 7, 2024) .......... 4

*Koenigsberg v. Bd of Trustees of Columbia Univ.y in City of New York*,
No. 23 Civ. 1044, 2024 WL 3876553 (S.D.N.Y. Aug. 20, 2024) .......... 13, 14

*In re Level 8 Apparel. LLC*,
Case No. 16-13164, Adv. Pro. No. 19-1335, 2021 WL 1977161 (Bankr. S.D.N.Y. May 17, 2021) .......... 17

*Lopez, v. Nassau Cnty. Sheriffs Dep't*,
No. 17-CV-3722, 2018 WL 3321430 (E.D.N.Y. July 5, 2018) .......... 14

*Martin v. Meredith Corp.*,
657 F. Supp. 3d 277 (S.D.N.Y. 2023) .......... 5

*Menominee Indian Tribe of Wis. v. United States*,
577 U.S. 250 (2016) .......... 14

*In re Merrill, BofA, & Morgan Stanley Spoofing Litig.*,
No. 19-cv-6002, 2021 WL 827190 (S.D.N.Y. March 4, 2021) .......... 17

*Miller v. Potter*,
No. 07-CV-1767, 2007 WL 4615611 (E.D.N.Y. Nov. 29, 2007) .......... 13

*In re Nickelodeon Consumer Privacy Litig.*,
827 F.3d 262 (3d Cir. 2016) .......... 1, 5, 9, 14

*Pace v. DiGuglielmo*,
544 U.S. 408 (2005) .......... 13

*Pearl v. City of Long Beach*,
296 F.3d 76 (2d Cir. 2002) .......... 13, 16

*U.S., ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023) .......... 7

*Rio Tinto PLC v. Vale*,
No. 14-CV-3042, 2015 WL 7769534 (S.D.N.Y. Nov. 20, 2015) .......... 19

*Robinson v. Disney Online*,
152 F. Supp. 3d 176 (S.D.N.Y. 2015) .......... 8, 12

*Salinger v. Projectavision, Inc.*,
972 F. Supp. 222 (S.D.N.Y. 1997) .......... 19

*SAS Inst., Inc. v. Iancu*,
584 U.S. 357 (2018) .......... 7

*Schneider v. Colgate-Palmolive Co.*,
677 F. Supp. 3d 91 (N.D.N.Y. 2023) .......... 19

*State v. Mixton*,
478 P.3d 1227 (Ariz. 2021) .......... 14

*Statler v. Dell, Inc.*,
841 F. Supp. 2d 642 (E.D.N.Y. 2012) .......... 20

*United States v. Stanko*,
491 F.3d 408 (8th Cir. 2007) .......... 6

*Valverde v. Stinson*,
224 F.3d 129 (2d Cir. 2000) .......... 14

*Wilson v. Triller, Inc.*,
598 F. Supp. 3d 82 (S.D.N.Y. 2022) .......... 2, 9

*World Wrestling Entertainment Inc. v. Jakks Pacific, Inc.*,
530 F. Supp. 2d 486 (S.D.N.Y. 2007) .......... 16

*Yershov v. Gannett Satellite Info. Network, Inc.*,
820 F.3d 482 (1st Cir. 2016) .......... 9

**Statutes**

18 U.S.C. .......... 5

18 U.S.C. § 2710 .......... 1

18 U.S.C. § 2710(a)(3) .......... 6, 8

18 U.S.C. § 2710(a)(4) .......... 6, 7

18 U.S.C. § 2710(b) .......... 5

18 U.S.C. § 2710(b)(1) .......... 8

18 U.S.C. § 2710(c)(3) .......... 12

**Federal Rules**

Rule 9(b) .......... 19

Rule 12(b)(6) .......... 4, 5

## INTRODUCTION

As Judge Robert Bork's Supreme Court confirmation hearings were approaching in 1987, a reporter visited the judge's local video store and asked for a list of the movies he had recently rented. The store clerk complied, and the reporter's newspaper published the list of 146 specific movie tapes Bork's family had rented over the previous two years. *See* Andrea Peterson, How Washington's Last Remaining Video Rental Store Changed the Course of Privacy Law, WASHINGTON POST (Apr. 28, 2014), https://www.washingtonpost.com/news/the-switch/wp/2014/04/28/how-washingtons-last-remaining-video-rental-store-changed-the-course-of-privacy-law (last visited January 21, 2025). Distressed by this invasion of privacy, and seeking to ensure that movie viewing habits could not again be weaponized to attack individuals' characters or embarrass them through public disclosure, the following year Congress passed the Video Privacy Protection Act ("VPPA"). *See, e.g.*, *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1252-53 (11th Cir. 2015).

The VPPA is a relatively straightforward statute. Consistent with its purpose, it proscribes "video tape service providers" ("VTSPs") from knowingly disclosing "personally identifiable information" ("PII")—specifically, information that identifies a consumer and the "video cassette tapes or similar audio visual materials" they purchased or rented—without the consumer's consent. 18 U.S.C. § 2710 (emphasis added). Violations are subject to statutory penalties of $2,500 and attorney's fees. *Id.* § 2710(c).

Congress intended for this law to be "quite narrow." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 284-85 (3d Cir. 2016). But recently, in an effort to exploit the VPPA's severe remedies, plaintiff's attorneys have sought to apply the VPPA exceptionally broadly, bringing nationwide class actions seeking tens or hundreds of millions of dollars against a wide swath of entities that provide virtually *any* form of prerecorded video on the Internet. For

example, this case involves a website that provides *educational videos*, not movies like one would find on video cassette tapes, which is the focus of the statute.

Such corruption of the VPPA is made possible by a quirk in modern websites' ordinary back-end functionality, combined with ambiguous, "not well drafted" language in the VPPA, in particular in the definitions of VTSPs and PII. *Wilson v. Triller, Inc.*, 598 F. Supp. 3d 82, 90 (S.D.N.Y. 2022) (citation omitted). Plaintiff's Class Action Complaint (Dkt. 1) ("Complaint") alleges that, like many websites, www.becker.com (the "Website") uses "a snippet of programming code called the 'Meta Pixel' (the 'Pixel')." *Id.* ¶ 6. Such Pixels transmit aspects of users' Internet activity to third parties. According to the Complaint, the Pixel installed on the Website disclosed information to Meta, including "the subscriber's Facebook ID ("FID") and the title of the specific prerecorded video material that each of its subscribers requested or purchased on its Website." *Id.* ¶ 7. The Complaint asserts that the unexceptional, ordinary operation of the ubiquitous Pixel violates the VPPA.

In today's hyper-connected world, few if any Internet users would be surprised to learn that their browsing, viewing, or transaction activity is shared. In fact, the Complaint does not allege Plaintiff was harmed. It does not allege that *anyone*—whether at Facebook or otherwise—actually saw consumers' video viewing history, let alone that any consumer's information was ever disclosed to the public, or that any consumer suffered financial, emotional, or other injury. Nevertheless, the Complaint asserts that the unexceptional, ordinary operation of the Pixel violates the VPPA and subjects Defendant to massive statutory penalties.

The Court should dismiss the Complaint's misapplication of the VPPA to disclosure of information about consumers' viewing of educational videos, in particular when that information

was never made public. The purpose, language, and legislative history of the statute demonstrate that what the Complaint protests is not what the VPPA intended to punish.

The Complaint also fails to adequately plead a claim because the Complaint fails to allege that the disclosures specifically identified the videos Plaintiff accessed in a manner that is understandable to an ordinary person. Finally, the Complaint fails to allege facts supporting its request that Defendant be estopped from asserting the statute of limitations.

## BACKGROUND

### A. The Website

Defendant's becker.com Website provides educational videos, "such as CMA (Certified Management Account) Exam Review, CPA (Certified Public Accountant) Exam Review, and CPE (Continued Professional Education) materials for CPA, CMA and CPE students." Compl. ¶ 3.

### B. Plaintiff

According to the Complaint, Plaintiff is a resident of Rochester, New York. *Id*. ¶ 15. "Plaintiff Jones first purchased a CPA Exam Review package from Becker on May 20, 2020 and a CPE Compliance Tracker on January 19, 2024," and allegedly "watched the purchased pre-recorded CPA Exam Review videos on Becker's Website from May 2020 until September 2022, and CPE videos in January 2024" "on her personal devices … while logged into her Facebook account." *Id.* ¶¶ 70, 72-73. The Complaint further alleges that "[w]hen Plaintiff purchased and watched videos through Becker, Defendant disclosed her event data, which recorded and disclosed the videos' titles to Facebook" and also disclosed to Meta Plaintiff Jones's name, email, phone number, and Facebook ID. *Id*. ¶ 75.

### C. The Meta Pixel

The Complaint asserts that the disclosures in question were executed by a "snippet of programming code called the 'Meta Pixel'" installed on the Website. *Id.* ¶ 6. According to the Complaint, "[w]hen the Meta Pixel captures an action, it sends a record to Facebook. Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences." *Id.* ¶ 44. The Complaint describes Meta's "Core Audiences" as a "generalized dataset" advertisers use for their targeted advertisements.[1] *Id.* ¶ 42.

### D. The Claim and Proposed Classes

The Complaint asserts a single claim for violation of the VPPA on behalf of Plaintiff and a proposed class unlimited in temporal scope, consisting of "[a]ll persons in the United States who, while maintaining an account with Meta Platforms, Inc. f/k/a Facebook, Inc: (i) were registered subscribers of an online website, mobile application and/or any video-on-demand service or application owned, controlled, and/or operated by Becker and (ii) who viewed videos on an online website, mobile application, or any video-on-demand service or application owned, controlled, and/or operated by Becker." *Id.* ¶ 86.

## ARGUMENT

"To withstand dismissal, a complaint must set forth 'enough facts to state a claim to relief that is plausible on its face.'" *Jones v. Commissioner of Social Security*, No. 6:23-CV-06265, 2024 WL 475050, at *2 (W.D.N.Y. Feb. 7, 2024) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the

[1] The Complaint does not describe what the "Custom Audiences" dataset is.

elements of a cause of action will not do." *Id.* (quoting *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted)).

## I. PLAINTIFF'S VPPA CLAIM FAILS IN MULTIPLE WAYS.

The VPPA was passed in 1988 in response to the publication of the movie video rental history of Judge Robert Bork, in connection with his 1987 Supreme Court confirmation hearing:

> Congress enacted the VPPA in 1988 after a newspaper "published a profile of [Supreme Court nominee and then D.C. Circuit] Judge Robert H. Bork" which contained the titles of 146 films he and his family had rented from a local video store.… Senator Patrick Leahy explained that the new law was meant to protect "our right to privacy [in] the choice of *movies* that we watch with our family in our own homes….

*Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1252-53 (11th Cir. 2015) (emphasis added) (quoting 134 Cong. Rec. S5396–08, S. 2361 (May 10, 1988)).

The VPPA provides a consumer with a cause of action if a "video tape service provider" knowingly discloses the consumer's PII and the title of the video without the consumer's consent. 18 U.S.C. § 2710(b). *See also Martin v. Meredith Corp.*, 657 F. Supp. 3d 277, 284 (S.D.N.Y. 2023) ("To state a claim under [the VPPA], a plaintiff must allege that (1) a defendant is a 'video tape service provider,' (2) the defendant disclosed 'personally identifiable information concerning any customer' to 'any person,' (3) the disclosure was made knowingly, and (4) the disclosure was not authorized [by the consumer].") (quoting *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015)); *see also In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 266 (3d Cir. 2016) (The VPPA "protects personally identifiable information that identifies a specific person and ties that person to particular videos that the person watched.").

The statute defines "video tape service provider" to be "any person, engaged in the business … of rental, sale, or delivery of prerecorded *video cassette tapes or similar audio visual materials*." 18 U.S.C at 2710(a)(4) (emphasis added). The statute defines "personally identifiable

information" to "include information which identifies a person as having requested or obtained *specific* video materials or services from a video tape service provider . . . ." *Id.* § 2710(a)(3) (emphasis added).

### A. The VPPA's Text And Legislative History Indicate Video Tape Service Providers Are Limited To Providers Of Pre-Recorded Materials "Similar" To Movies, Not Educational Videos Like Those On The Website.

The VPPA was intended to address conduct very different than alleged in the Complaint. Sparked by the newspaper article about Judge Bork, the VPPA was intended to prevent attacks on individuals' character through *public* disclosure of their *movie* viewing habits.

The formal title of the statute—"Wrongful disclosure of video tape rental or sales records"—clearly reflects this focus. As does the statutory language itself: Congress restricted the scope of VTSPs to entities that rent or sell materials "similar" to "prerecorded video cassette tapes." *Id*. § 2710(a)(4) (emphasis added). The word "similar" is limiting: "Congress use[s] the comparative term 'similar' to … indicate[] an intent to limit the … clause's reach to offenses which are 'comparable' or 'nearly corresponding' to the [specified conduct]." *See United States v. Stanko*, 491 F.3d 408, 414 (8th Cir. 2007) (quoting Webster's Third New Int'l Dictionary 2120 (2002)).

The legislative record for the statute's passage similarly emphasizes that the VPPA was designed to prevent disclosure of *movies* individuals viewed:

- "The *movies* we view in the privacy of our home … may reveal sensitive, personal information about us and should not be disclosed absent a compelling State interest…." Video and Library Privacy Protection Act of 1988: Joint Hearing on H.R. 4947 and S. 2361 Before the Subcomm. on Cts., C.L., & the Admin. of Just. of the H. Comm. on the Judiciary and the Subcomm. on Tech. & the Law of the S. Comm. on the Judiciary, 100th Cong. 54 (1998) ("1988 VPPA Joint Hearing") (emphasis added).

- **"**[A] person would have to consent to the—to a release of such information as the precise titles of *movies* taken out of a video store." *Id.* at 32 (emphasis added).

- "There's a gut feeling that people ought to be able to read books and watch *films* without the whole world knowing. Books and *films* are the intellectual vitamins that fuel the growth of individual thought." *Id.* at 27.

- **"**The term 'video tape service provider' means any person engaged in the business … of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials, *such as laser disks, open-reel movies, or CDI technology*…." S. Rep. No. 100-599 (1988), at 12 (emphasis added).

The Complaint disregards this statutory language and legislative history by targeting the alleged disclosure of consumers' viewing of not movies but *educational* videos. Rather than limiting Plaintiff's VPPA claim to videos "similar" to "prerecorded video cassette tapes," the Complaint appears to take the position that *any* video qualifies. (*See Compl. passim* (generically referring to the videos at issue as prerecorded "videos," "video content," or "video material")). The statute clearly is not so broad. It would have been exceedingly simple for Congress to have defined VTSPs to encompass distributors of *any* video. Congress chose not to, instead using the unwieldy clause "video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). That deliberate, unconventional language must be given effect. *See, e.g., U.S., ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 431 (2023) (emphasizing "the interpretive principle that every clause and word of a statute should have meaning") (internal quotations omitted); *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018) ("'Congress' choice of words is presumed to be deliberate and deserving of judicial respect . . . .") (internal quotations omitted).

At least one federal court in New York has recognized that the VPPA is limited to videos similar to films, explaining:

> While Congress explicitly recognized that these privacy values extend past *films*—by repeatedly referencing books—*Congress ultimately chose not to extend these protections to other materials*…. The Senate Report … indicates that 'similar audio visual material' refers more *narrowly* to prerecorded videos that *are films or have similar content rather than the generic world of audio visual materials that are pre-recorded*, full stop.

*Aldana v. Gamestop, Inc.*, No. 22-CV-7063-LTS, 2024 WL 708589, at *5 (S.D.N.Y. Feb. 21, 2024) (emphasis added) (internal citations omitted); *see also Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (observing generally "we are not persuaded that the 1988 Congress intended for the VPPA to cover circumstances so different from the ones that motivated its passage"); *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 184 (S.D.N.Y. 2015) (granting motion to dismiss, noting "[t]here is no doubt that the world of Roku devices, streaming video, and data analytics is a very different one from that of the physical video stores and tape rentals in which the VPPA was originally passed").

The conduct alleged here falls outside the VPPA. The Website provides educational material, not films. There is no suggestion that any disclosure has been or would be used to attack anyone's character. Nor is there any allegation that any PII disclosed by the Website is made public. To the contrary, if anything, one would think that consumers themselves might—routinely and voluntarily—disclose that they viewed the Website's content in order to satisfy continuing education requirements or for other purposes.

Plaintiff's theory suggests no limit to the type of videos within the VPPA's scope, contradicting the statute's language, purpose, and legislative history. Educational videos are not covered. Therefore, the Website is not a "video tape service provider," and Plaintiff's claim should be dismissed with prejudice.

### B. An Ordinary Person Could Not Identify PII From The Allegedly Disclosed Information.

The VPPA focuses on disclosure of PII. *See* 18 U.S.C. § 2710(b)(1). The statute defines PII as "includ[ing] information which identifies a person as having requested or obtained specific video materials or services from a [VTSP];" *i.e.*, information allowing identification of the consumer and the title of the prerecorded video they requested or obtained. 18 U.S.C.

§ 2710(a)(3). Such disclosure must be made in a form "that would readily permit an *ordinary person* to identify a specific individual's video-watching behavior." [2] *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 267 (3d Cir. 2016) (emphasis added). *See also Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (adopting "ordinary person" standard because it "better informs video service providers of their obligations under the VPPA."); *Wilson*, 598 F. Supp. 3d at 91 (stating "the majority of the courts to address this issue" have found PII to mean "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior.") (internal citations omitted).

The Complaint's unsupported, conclusory assertion that an ordinary person could use the Meta Pixel's disclosure to identify the individual and the specific video material they requested or obtained, Compl. ¶¶ 9, 45, 56-57, is unequivocally refuted by the Complaint's specific allegations. *See DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145,151-52 (2d Cir. 2014) (noting the court need not accept as true a complaint's general allegations "that are contradicted by more specific allegations") (internal quotations and citation omitted). The Complaint includes screenshots allegedly showing the exact disclosures the Meta Pixel made. *See* Compl. Figures 2-9. The jumbled mess of computer code is gibberish to any non-expert. The Complaint itself tacitly recognizes as much: even with the cherry-picked, carefully presented Figures, the Complaint recognizes the need to highlight (in red boxes) the relevant portions to aid comprehension of what the Figures purportedly show. *Id.* Yet, even with that considerable assistance, the PII in the disclosures—i.e., the Facebook ID and video title—is almost impossible

[2] The "ordinary person" test stands in contrast to a standard adopted only by the First Circuit, which focuses on whether the *actual recipient* of the disclosure would be able to use that information to identify the consumer and the specific video the consumer viewed. *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016). This distinction is often dispositive because, as discussed below, the ability of a sophisticated entity like Meta to interpret the convoluted, technical disclosures Plaintiff contends are made by the Meta Pixel is vastly different than the ability of the ordinary person.

to pick out. For example, Figures Seven and Eight found on page 19 of the Complaint, which the Complaint describes as "Examples of HTTP communication sessions sent from the customer's device by Becker's Pixel to Facebook that reveal [the consumer's personal identifiers and course she watched]," consist of coding gobbledygook that no ordinary person would recognize as containing contain a person's Facebook ID (assuming an ordinary person even knows what a Facebook ID is) and/or the title of the video that person supposedly requested or obtained. The Complaint's remaining Figures only reinforce this same point.

***Figures 7 & 8: Examples of HTTP communication sessions sent from the customer's device by Becker's Pixel to Facebook that reveal the fact that the subscriber is watching the online course "Excel: Cool Tricks," along with the customer 's unique personal identifiers including the FID (c_user field).***



If presented with any of the screenshots throughout in the Complaint, the ordinary person would not possibly know what to make of them. Specialized knowledge, and tools (*e.g.*, a Facebook account and a computer science degree) are required to decipher the information. The Complaint itself admits that the operation of the Meta Pixel is "highly technical." Compl. ¶ 83. *See also Edwards v. Learfield Commc'ns, LLC*, 697 F. Supp. 3d 1297, 1307-08 (N.D. Fla. 2023) (dismissing VPPA claim because "the complaint does not allege facts plausibly showing that the Gators Website's pixel 'readily permit[s] an ordinary person to identify Plaintiffs' video-watching behavior…. Although Plaintiffs do allege that the Gators Website transmits metadata, which contains c_user IDs and 'may' contain video titles … they offer no facts explaining how Facebook accesses that metadata, why doing so does not require technical expertise, or how much metadata Facebook has to comb through to discover someone's c_user ID and the video titles.").

As the Southern District emphasized, information cannot simply "become PII because of the potential, however remote, of a third party to 'reverse engineer' a disclosure using data gathered from other sources." *Robinson*, 152 F. Supp. 3d at 183. An "ordinary person" must be able to identify and understand any PII contained in the disclosure in question. By the Complaint's own allegations and Figures, the information that the Pixel allegedly transmitted does not allow an ordinary person to identify Plaintiff's identity (through her Facebook account), or the titles of any videos she requested or obtained.

## II. THE COMPLAINT FAILS TO PLEAD A BASIS FOR EQUITABLE TOLLING OR ESTOPPEL.

Plaintiff satisfies none of the elements required to equitably toll or estop the VPPA's two year statute of limitations. *See* Compl. ¶¶ 80-85; 18 U.S.C. § 2710(c)(3).[3]

[3] "The burden of demonstrating the appropriateness of equitable tolling ... lies with the plaintiff." *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000).

### A. Equitable Tolling Is Not Warranted.

"[A] litigant seeking equitable tolling bears the burden of establishing two elements: (1) that [s]he has been pursuing [her] rights diligently, and (2) that some extraordinary circumstance stood in [her] way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). The threshold for establishing these requirements is high; "[t]he Second Circuit has repeatedly cautioned that 'equitable tolling is considered a drastic remedy applicable only in rare and exceptional circumstances.'" *Contrera v. Langer*, 278 F. Supp. 3d 702, 723 (S.D.N.Y. 2017) (quoting *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 144 (2d Cir. 2011)); *see also Foster v. Walgreen Co.*, 12 F. Supp. 3d 615, 617-18 (W.D.N.Y. 2014) (Wolford, J.) (stating equitable tolling is "only appropriate in 'rare and exceptional circumstances in which a party is prevented in some extraordinary way from exercising his rights.'") (citation omitted).[4]

#### *i. The Complaint does not allege "extraordinary circumstances."*

For purposes of the equitable tolling analysis, "extraordinary circumstances" involve "a situation where a plaintiff 'could show that it would have been *impossible* for a reasonably prudent person to learn' about his or her cause of action." *Pearl v. City of Long Beach*, 296 F.3d 76, 85 (2d Cir. 2002) (emphasis in original) (quoting *Miller v. Int'l Telephone & Telegraph Corp.*, 755 F.2d 20, 24 (2d Cir. 1985)). "The Second Circuit's use of the term 'impossible' reflects the fact that 'equitable tolling will not be invoked unless ... Plaintiff was prevented in some extraordinary way from exercising her rights.'" *Koenigsberg v. Bd of Trustees of Columbia Univ.y in City of New York*, No. 23 Civ. 1044, 2024 WL 3876553, at *6 (S.D.N.Y. Aug. 20,

[4] Equitable tolling may be determined on a motion to dismiss because it is alleged in the Complaint. *See, e.g.*, *Alvi v. Aqua at Lakeshore East LLC*, No. 12 CV 2662, 2013 WL 3785622, at *5 (E.D.N.Y. July 18, 2013) ("Because the purported misrepresentations and omissions are also alleged in the Complaint … it is appropriate to consider plaintiff's equitable tolling argument in the context of a motion to dismiss."); *Miller v. Potter*, No. 07-CV-1767, 2007 WL 4615611, at *3 n.5 (E.D.N.Y. Nov. 29, 2007) (noting the court may consider equitable tolling at motion to dismiss stage because "plaintiff included his basis for equitable tolling in the complaint").

2024) (quoting *Graham v. HSBC Mortg. Corp.*, No. 18 Civ. 4196 (KMK), 2020 WL 5663394, at *5 (S.D.N.Y. Sept. 23, 2020)) (cleaned up).

Such exceedingly rare situations include, for example, "where a plaintiff's mental or physical disability prevented him from handling his legal affairs," *Lopez, v. Nassau Cnty. Sheriffs Dep't*, No. 17-CV-3722, 2018 WL 3321430, at *5 (E.D.N.Y. July 5, 2018); a corrections officer's intentional confiscation of a prisoner's petition shortly before the filing deadline, *Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000); or an attorney's refusal to follow the client's explicit instructions to file a petition, *Baldayaque v. United States*, 338 F.3d 145, 150–53 (2d Cir. 2003). As illustrated by these examples, the "extraordinary circumstance" requirement "is met only where the circumstances that caused a litigant's delay are both extraordinary *and* beyond its control." *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 257 (2016) (emphasis in original).

The Complaint alleges nothing remotely similar. It makes only the generic allegation that Plaintiff was unaware that the Pixel shared that she viewed the Website's educational videos on the Website with Meta. *See* Compl. ¶¶ 8, 68. A "conclusory allegation that 'Defendant's conduct is self-concealing' does not suffice." *Koenigsberg*, 2024 WL 3876553, at *6.

As a threshold matter, the allegation that consumers are unaware that their Internet activity is being shared is not credible. Such tracking is ubiquitous and well known to anyone using the Internet. *See In re Nickelodeon*, 827 F.3d at 266 ("Most of us understand that what we do on the Internet is not completely private…. We recognize, even if only intuitively, that our data has to be going somewhere. And indeed it does, feeding an entire system of trackers, cookies, and algorithms designed to capture and monetize the information we generate.… [T]he data-collecting infrastructure of the digital world hums along quietly in the background"); *State*

*v. Mixton*, 478 P.3d 1227, 1238 (Ariz. 2021) ("Our 'ubiquitous and pervasive internet use' that is 'internet-connected, cloud-dependent, and app-reliant for personal communications, all manner of commercial transactions, 24-7 entertainment, and universal positional tracking,' makes it hard to believe that anyone still retains 'this largely antiquated notion' of 'anonymity in their internet use.'") (citation omitted).

Moreover, the Complaint does not (and cannot) allege that anyone prevented Plaintiff from ascertaining the information on which her claim is based. To the contrary, the Complaint's extensive (publicly available) screenshots of the disclosures along with the assertion that "any ordinary person" could use them to determine Plaintiff's identity preclude any such position. *See, e.g.*, Compl. ¶¶ 9, 56-57. *See In re Columbia College Rankings Class Action*, No. 22-cv-5945, 2024 WL 1312511, at *13 (S.D.N.Y. Mar. 6, 2024) ("Plaintiffs have not pled facts plausibly demonstrating that Columbia's misrepresentations would have been impossible to detect prior to July 12, 2022, or August 2, 2022, when Plaintiffs filed their respective complaints…. Indeed, the Amended Complaint's allegations concerning Professor Thaddeus' article [showing Columbia misreported information] – which is based on publicly available data – demonstrate the contrary.").

In fact, the foundation of the Complaint's request for equitable estoppel—that Defendant supposedly did not disclose that the Meta Pixel was incorporated on the Website or that Plaintiff's viewing behavior would be shared, Compl. ¶ 82—is simply false. Becker's "Cookie Policy" and "Privacy Policy," both of which are available through prominent links on

Becker.com's homepage,[5] provide exactly such notice. The Cookie Policy lists the cookies the Website used, including, specifically, cookies for Facebook.[6] And the Privacy Policy states that the Website "collect[s] various types of personal information when you use our site and choose to engage with us," and shares such information with third-party "marketing services providers."[7]

It was far from "*impossible* for a reasonably prudent person to learn" about Plaintiff's cause of action. *Pearl*, 296 F.3d at 85 (emphasis in original). The facts pled in the Complaint were readily available to her. The facts here do not constitute the type of exceptional or extraordinary circumstance required to establish equitable tolling.

***ii. The Complaint does not allege Plaintiff's due diligence.***

The Complaint vaguely alleges unidentified "active concealment" by Becker, Compl. ¶ 80, but provides no facts or details regarding what this supposed concealment was. In any event, "'even when a plaintiff pleads active concealment by the defendant, the plaintiff must still demonstrate that [s]he exercised due diligence in trying to discover the fraud.'" *World Wrestling Entertainment Inc. v. Jakks Pacific, Inc.*, 530 F. Supp. 2d 486, 529 (S.D.N.Y. 2007) (quoting *In re Merrill Lynch Ltd. P'ships Litig.*, 7 F. Supp. 2d 256, 274 (S.D.N.Y. 1997).

---

[5] These portions of Becker's website may be considered with this Motion to Dismiss because the Complaint expressly references and incorporates Becker's website, *see Acquest Holdings, Inc v. Travelers Cas. & Surety Co*., 217 F. Supp. 3d 678 (W.D.N.Y. 2016), and because the Complaint "relies heavily upon [the] terms and effect" of Becker's data policies to contend that Plaintiff was not aware of the Meta Pixel, which "renders the document integral to the complaint." Compl. ¶ 17, 38-40, 82; *Chambers v. Time Warner, Inc*., 282 F.3d 147, 153 (2d Cir. 2002); *Hughes v. Nat'l Football League*, No. 1:22-cv-10743, 2024 WL 4063740, at *1 (Sept. 5, 2024) (considering NFL's Privacy Policy cited in complaint in granting motion to dismiss VPPA claim). The Court may also take judicial notice of these webpages for the purpose of determining what they state because the authenticity of Becker's website – which the Complaint directly hyperlinks to many times – is not in dispute. Compl. ¶ 17, 38-40. *Grecco v. Age Fotostock Am., Inc*., No. 21-cv-423, 2021 WL 3353926, at *3 (S.D.N.Y. Aug. 2, 2021) ("At the motion-to-dismiss stage, 'a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute.' ") (citation omitted).

[6] https://www.becker.com/online-cookie-policy (last visited January 21, 2025).

[7] https://www.becker.com/privacy-policy (last visited January 21, 2025).

The Complaint fails to allege Plaintiff made any attempt to discover her claim. As discussed above, the facts on which her claim was based were readily available. The Complaint's conclusory allegation that Plaintiff "could not with due diligence have discovered" the basis for her claim, Compl. ¶ 83, is ineffective. For example, in *Fire & Police Association of Colorado v. Bank of Montreal*, the Southern District denied a request for equitable tolling involving essentially the same allegation:

> Nor has Plaintiff plausibly alleged that it exercised due diligence. The complaint does not allege that Plaintiff performed due diligence, instead stating that "Plaintiff and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by exercise of due diligence." "Due diligence is not adequately pled if plaintiffs 'did not allege in the [complaint] that they exercised due diligence' or if they 'make no allegation of any specific inquiries of [defendants], [or] detail when such inquiries were made, to whom, regarding what, and with what response.'"

368 F. Supp. 3d 681, 703-04 (S.D.N.Y. 2019) (quoting *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 521 (S.D.N.Y. 2009)) (internal citations omitted). *See also Broccoli v. Ashworth*, No. 21-CV-6931, 2024 WL 1199549, at *6 (S.D.N.Y. Mar. 20, 2024) (denying equitable tolling claim because "[e]ven assuming Plaintiffs have adequately pled fraudulent concealment that prevented them from discovering Defendants' alleged scheme within the limitations period … Plaintiffs fail to provide any allegations, let alone particularized allegations, regarding their due diligence to discover the nature of their claims"); *In re Level 8 Apparel. LLC*, Case No. 16-13164, Adv. Pro. No. 19-1335, 2021 WL 1977161, at *7 (Bankr. S.D.N.Y. May 17, 2021) ("To establish the propriety of equitable tolling based on self-concealing fraud, plaintiff's due diligence in attempting to discover the fraud is imperative."); *In re Merrill, BofA, & Morgan Stanley Spoofing Litig.*, No. 19-cv-6002, 2021 WL 827190, at *11 (S.D.N.Y. March 4, 2021) ("[E]ven if Defendants' alleged spoofing were self-concealing or their statements were enough to invoke fraudulent concealment, Plaintiffs have not made a showing of due diligence in

investigating their claims. Plaintiffs have not alleged that they made any efforts at all during the limitations period to investigate. As such, Plaintiffs have not adequately pleaded due diligence."). The Complaint does not allege the diligence required to establish equitable tolling.

**B. Equitable Estoppel Is Not Warranted.**

The Complaint's alternative assertion that Becker should be equitably estopped from enforcing the statute of limitations, Compl. ¶¶ 80-85, likewise lacks merit.

"To invoke equitable estoppel, a plaintiff must show that: (1) the defendant made a definite misrepresentation of fact, and had reason to believe that the plaintiff would rely on it; and (2) the plaintiff reasonably relied on that misrepresentation to [her] detriment." *Buttry v. Gen. Signal Corp*., 68 F.3d 1488, 1493 (2d Cir. 1995)). "Unlike equitable tolling, which is invoked in cases where the plaintiff is ignorant of his cause of action because of the defendant's fraudulent concealment, equitable estoppel is invoked in cases where the plaintiff knew of the existence of [her] cause of action, but the defendant's conduct caused [her] to delay in bringing his lawsuit." *Ellul v. Congregation of Christian Bros*., 774 F.3d 791, 802 (2d Cir. 2014) (quoting *Cerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 49–50 (2d Cir. 1985). "Equitable estoppel applies in cases where, for example, the defendant lulls the plaintiff into not filing suit with assurances that she will settle the case." *Id*.[8]

The Complaint satisfies none of these elements. First, by her own allegations, Plaintiff was not aware of her claim until she met with her lawyers in October 2024, just days, or at most a few weeks, before she filed the Complaint on November 1, 2024. Compl. ¶ 85. Second, the Complaint does not allege Defendant made any misrepresentation or took any other action that prevented or delayed her from filing her claim. Third, based on the above, there was nothing for

[8] Equitable estoppel may be determined on a motion to dismiss because it is alleged in the Complaint. *Abercrombie v. Andrew Coll*., 438 F. Supp. 2d 243, 266 (S.D.N.Y. 2006) (holding equitable estoppel is properly resolved on a motion to dismiss where "plaintiff fails to adequately plead the requisite facts in support").

Plaintiff to rely on to her detriment, defeating the final element of the doctrine. Each of these failures is independently sufficient to require dismissal of the Complaint's request for equitable tolling.

**C. Plaintiff's allegations fail to satisfy Rule 9(b).**

Plaintiff's "active concealment" allegations can also be dismissed out of hand because the Complaint does not allege concealment with any level of particularity. *Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 232 (S.D.N.Y. 1997) ("In pleading either passive or active concealment, the plaintiff must comply with the particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure."); *Rio Tinto PLC v. Vale*, No. 14-CV-3042, 2015 WL 7769534, at *8 (S.D.N.Y. Nov. 20, 2015) ("A plaintiff attempting to apply fraudulent concealment must plead each of [its] elements with particularity as required by Rule 9(b).") (internal citation omitted).

Instead, the Complaint relies only on conclusory, general assertions and lacks any allegations stating the who, what, when, where, and how of the alleged concealment. *Schneider v. Colgate-Palmolive Co.*, 677 F. Supp. 3d 91, 101 (N.D.N.Y. 2023) ("Pleading fraud with particularity means specifying the 'who, what, when, where, and how [of the fraud].'") (brackets in original) (quoting *Reynolds-Sitzer v. EISAI, Inc.*, 586 F. Supp. 3d 123, 135 (N.D.N.Y. 2022)). *See also De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 319 (S.D.N.Y. 2013) ("Generalized or conclusory allegations of fraudulent concealment are not sufficient to toll a statute of limitations."); *Futterman v. Wash. Mut. Bank, FA*, No. 1:10-CV-01002, 2010 WL 5067650, at *2 (N.D.N.Y. Dec. 6, 2010) ("The Court finds that the equitable tolling standard has not been satisfied. Plaintiff has made only broad allegations, void of any specific factual references, that 'Defendants actively concealed the complete truth from Plaintiff with the intent

of defrauding Plaintiff.'") Because the Complaint's allegations regarding concealment fail to meet the requirements of Rule 9(b), the claims for tolling or estoppel should be dismissed.

* * *

"Whether referred to as 'equitable tolling,' or 'equitable estoppel,' tolling is applied only in rare circumstances when the defendant's fraudulent conduct either conceals the existence of a cause of action or acts to delay Plaintiff from commencing a lawsuit." *Statler v. Dell, Inc.*, 841 F. Supp. 2d 642, 647 (E.D.N.Y. 2012) (internal citations omitted). The Complaint's conclusory allegations that Plaintiff lacked knowledge of the Pixel do not support application of either doctrine.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated: January 22, 2025

**ARMSTRONG TEASDALE LLP**

By: */s/ IJay Palansky*
Jeffrey A. Wurst
A Member of the Firm
7 Times Square, 44th Floor
New York, NY 10036
212.209.4443
jwurst@atllp.com

IJay Palansky (*admitted pro hac vice*)
4642 S. Ulster Street, Suite 800
Denver, Colorado 80237
720.200.0676
720.200.0679 (facsimile)
ipalansky@atllp.com

Paul Croker (*admitted pro hac vice*)
Nick Slovikoski (*admitted pro hac vice*)
2345 Grand Blvd., Suite 1500
Kansas City, Missouri 64108
Telephone: 816.221.3420
Fax: 816.221.0786
pcroker@atllp.com
nslovikoski@atllp.com

*Counsel for Defendant Becker Professional Development Corporation d/b/a Becker Professional Education*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on January 22, 2025, the foregoing was filed electronically using the Court's CM/ECF system which will serve a copy upon all parties of record.

*/s/ IJay Palansky*
*IJay Palansky*